United States Court of Appeals
Fifth Circuit

**F I L E D**

**November 30, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

No. 05-70045

———————————————

CHARLES E. SMITH,

Petitioner - Appellant,

versus

NATHANIEL QUARTERMAN, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS
DIVISION,

Respondent - Appellee.

———————————————————————————————————————

Appeal from the United States District Court
for the Western District of Texas, Pecos
USDC No. 4:03-CV-113

———————————————————————————————————————

Before JOLLY, DAVIS, and OWEN, Circuit Judges.

E. GRADY JOLLY, Circuit Judges:

Charles E. Smith was convicted and sentenced to death in Texas for the 1988 capital murder of Pecos County Deputy Sheriff Tim Hudson. He appeals the district court's denial of federal habeas relief on his claim that his counsel rendered ineffective assistance by failing to present any evidence at the punishment phase of the trial. Because Smith has not demonstrated that the state court's decision is contrary to, or an unreasonable application of, clearly established federal law, we AFFIRM the judgment of the district court denying federal habeas relief.

In August 1988, Smith was an inmate at a Kansas correctional facility, serving a sentence for burglary, theft, and aiding a felon. He and his cousin, Carroll Smith, who was also incarcerated at the same facility, escaped. At the time of the escape, Smith had approximately one month left to serve before he would have been eligible for parole. They stole a pick-up truck and drove to Houston, Texas. While in Houston, they burglarized several homes and stole credit cards, jewelry, license plates, and a .357 magnum pistol and ammunition. They abandoned the stolen truck and replaced it with a stolen van, and began driving west toward New Mexico. They stopped and pumped gasoline worth $22.50 into the van in Bakersfield, Texas, and drove away without paying. Officer Tim Hudson, a Pecos County Deputy Sheriff, and other law enforcement officers responded to the reported theft. Smith, who was driving the van, refused to stop when the officers tried to pull him over. When Deputy Hudson pulled alongside the van, Smith fired three shots into Deputy Hudson's car, one of which fatally wounded Deputy Hudson.

Smith and his cousin continued to evade law enforcement officers. They made their way to a rural farm where they stole a .22 rifle and ammunition. They also stole a tractor truck and set the van on fire. As they approached a road block, they made a U-turn, and a high-speed chase, exceeding speeds of 100 miles per hour, ensued. Gunfire was exchanged between Smith and his cousin

in the tractor truck and law enforcement officers pursuing them on the ground and by helicopter.  Eventually Smith drove the tractor truck off the road and was apprehended.

He made two videotaped confessions while in custody.

Smith was tried and convicted of capital murder and sentenced to death in August 1989.  The Texas Court of Criminal Appeals reversed his conviction and sentence in December 1991, holding that the trial court had abused its discretion by denying Smith's challenge for cause to strike a biased juror.  Smith v. State, No. 71,010 (Tex. Crim. App. December 4, 1991) (unpublished).  He was retried and convicted in June 1992.  The trial court submitted only two special issues to the jury:  (1) whether there was a probability that Smith would commit criminal acts of violence constituting a continuing threat to society; and (2) whether there were any mitigating circumstances that warranted a sentence of life imprisonment.  The Texas Court of Criminal Appeals affirmed the conviction, but remanded the case for a new sentencing hearing because the trial court did not instruct the jury and submit a special issue on whether Smith acted deliberately.  Smith v. State, 907 S.W.2d 522 (Tex. Crim. App. 1995).  At his third punishment trial in November 1999, the jury found that Smith had acted deliberately, that he would constitute a danger to society in the future, and that there were no mitigating circumstances that would warrant a sentence of life imprisonment rather than the death penalty.  The Texas Court of Criminal Appeals affirmed the sentence

3

on direct appeal in May 2002. Smith v. State, 74 S.W.3d 868 (Tex. Crim. App. 2002).

Smith was represented by attorney Martin Underwood at all three of his trials.

In October 2003, the Texas Court of Criminal Appeals adopted the state habeas trial court's findings of fact and conclusions of law and denied post-conviction relief. Ex parte Smith, No. 57,076-01 (Tex. Crim. App. October 22, 2003) (unpublished).

Smith filed a petition for federal habeas relief in October 2004. In September 2005, the district court granted the State's motion for summary judgment and denied relief. Smith v. Dretke, No. P-03-CV-113 (W.D. Tex. September 16, 2005) (unpublished).

II

The district court granted a certificate of appealability authorizing Smith to appeal the denial of habeas relief as to the following issues:

1. Whether Smith was denied effective assistance of counsel in his 1999 punishment trial when his trial counsel failed to present any mitigation evidence to the punishment jury; and/or

2. whether Smith in his 1999 punishment trial was denied effective assistance of counsel when his trial counsel failed to offer any rebuttal evidence on the issue of future dangerousness; and/or

3. whether Smith was denied effective assistance of counsel at his 1999 punishment trial when his trial counsel failed to investigate mitigation evidence adequately thereby wrongfully deciding not to present mitigation evidence to the jury considering punishment; and/or

4

> 4. whether Smith's Eigh[th] Amendment rights were violated when the 1999 jury heard no evidence from petitioner on mitigating factors.

The parties did not brief these issues separately, but instead grouped them together in the same discussion.[1]

Smith is not entitled to federal habeas relief on his claims unless the state court's adjudication of the claims

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The state court's factual determinations "shall be presumed correct", and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### A

Smith claims that his counsel at the third punishment trial in 1999 rendered ineffective assistance by failing to present any mitigating evidence, by failing to present any rebuttal evidence on the issue of future dangerousness, and by failing adequately to

---

[1]Smith's contention that his Eighth Amendment rights were violated when the 1999 jury heard no evidence from him on mitigating factors is not adequately briefed and therefore any separate claim of an Eighth Amendment violation based on counsel's decision not to present evidence at the punishment phase is abandoned.

investigate mitigating evidence. We review these claims under the clearly established law of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).[2] To prevail, Smith must show that his counsel rendered deficient performance, and that his defense was prejudiced by the deficiencies. <u>Id</u>. at 687. Counsel's performance was deficient if it "fell below an objective standard of reasonableness." <u>Id</u>. at 688. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." <u>Id</u>.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all

---

[2]Smith's argument that, because counsel presented no witnesses, prejudice should be presumed, is without merit. Smith did not present this claim to the state court, and so it is unexhausted. <u>See</u> <u>Wilder v. Cockrell</u>, 274 F.3d 255, 259 (5th Cir. 2001) ("where petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement") (internal quotations and citation omitted). In any event, the presumptive prejudice standard does not apply because counsel chose, as a matter of strategy, not to present any witnesses in order to avoid opening the door to damaging evidence. <u>See</u> <u>Bell v. Cone</u>, 535 U.S. 685, 697-98 (2002) ("the failure to adduce mitigating evidence and the waiver of closing argument are plainly of the same ilk as other specific attorney errors we have held subject to <u>Strickland</u>'s performance and prejudice components"). Counsel's strategic decision not to present evidence did not result in the constructive denial of counsel.

6

the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690-91. "[O]ur principal concern in deciding whether [Smith's counsel] exercised reasonable professional judgment is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Smith's] background *was itself reasonable*." Wiggins v. Smith, 539 U.S. 510, 522-23 (2003 (internal quotations and brackets omitted; emphasis in original). "In assessing counsel's investigation, we must conduct an objective review of their performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." Id. at 523 (internal quotations omitted). There is a "strong presumption" that counsel's conduct "falls within the wide range of reasonable professional assistance," and we may "not find ineffective assistance of counsel merely because [we] disagree[] with counsel's trial strategy." Bell v. Cone, 535 U.S. 685, 698 (2002); Strickland, 466 U.S. at 689.

The American Bar Association Guidelines for representation of defendants at capital sentencing proceedings state:

> A. Counsel should present to the sentencing entity ... all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence.

B. Among the topics counsel should consider presenting are:

1. Medical history (including mental and physical illness or injury, alcohol and drug use, birth trauma and development delays);

2. Educational history (including achievement, performance and behavior), special educational needs (including cognitive limitations and learning disabilities), an opportunity or lack thereof;

....

5. Family and social history; ...

6. Rehabilitative potential of client;

7. Record of prior offenses, adult and juvenile, especially where there is no record, a short record, or a record of non-violent offenses;

8. Expert testimony concerning any of the above and the resulting impact on the client relating to the offense and to the client's potential at the time of sentencing.

See Strickland, 466 U.S. at 688 (referring to Bar Association standards as guides); Wiggins, 123 S.Ct. at 2536 (same). "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." Wiggins, 593 U.S. at 533. "Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case." Id.

We now turn to consider the evidence presented at the 1999 punishment trial, the evidence that Smith contends his counsel

8

should have presented, counsel's explanation of why he decided not to present that evidence, and the state court's decision.

B

At the third punishment trial in 1999, the State presented testimony relating to the crime:  the theft of gas, the pursuit by Deputy Hudson and other law enforcement officers, the murder of Deputy Hudson, and the subsequent high-speed chase leading to Smith's capture.  Smith's videotaped confessions were also played for the jury.

In addition, the State presented evidence regarding the crimes for which Smith was incarcerated in Kansas before his escape.  In 1987, Smith pleaded guilty to felony burglary and felony theft, admitting that he and a companion, Jeff Miers, had broken into a house and stolen a rifle.  Smith's conviction for aiding a felon stemmed from his presence on January 22, 1987, when Miers used that gun to kill Martin Esquivel and wound his brother, Fernando Esquivel, in Garden City, Kansas.  One witness testified that Smith urged Miers to "shoot the [****ing] Mexicans".

John Nondorf, the Kansas probation officer who prepared the presentence investigation report for the burglary and theft convictions, testified that Smith told him that he was riding a bicycle and was hit by a car when he was 13 years old; that he went to the hospital for one day, but had no serious complications from the accident; and that he had no drug problems and only drank alcohol on a social basis.  Sally Ann Ochoa, the probation officer

9

who prepared the presentence investigation report for Smith's conviction for aiding a felon (relating to Smith's involvement in the Esquivel murder), testified that Smith did not express any remorse and seemed unconcerned. Both probation officers concluded that Smith was not a suitable candidate for probation and recommended that he be sentenced to prison.

Norma Jean Jackson, a correctional officer in Kansas, testified that while Smith was incarcerated in the facility where she was employed, he violated the facility's rules by shoving her as she stood in a doorway. Joyce Whitt, another correctional officer from Kansas, testified that Smith escaped from the Kansas facility when he had approximately a month left to serve before being eligible for parole, and that he could have faced two years in prison if he had been captured.

Mark Yates, who was incarcerated in a cell adjoining Smith's cell in the Pecos County Jail, testified that Smith showed no remorse for the murder of Deputy Hudson and stated that he (Smith) had slept like a baby the first night in jail. Yates also testified that Smith told him that, by killing a police officer, he had fulfilled one of the goals of his life.

Cliff Harris, who supervised the jailers in Pecos County, testified about contraband found in Smith's cell and in the maximum security area where he was housed. He testified that they had numerous problems with Smith: he set his blankets on fire once; he fought with other inmates; he had a very short temper and when he

10

lost his temper, he tore things up; he intimidated other inmates and dominated the maximum security cellblock; and he was a danger to other inmates and the jailers.  Sam Esparza testified that while he was assisting with visitation at the Pecos County Jail, he broke up a fight between Smith and another inmate.  T. J. Perkins, another jailer at the Pecos County Jail, testified that Smith grabbed him through the bars and that he felt that his life was in danger.  He also testified that he heard Smith singing a song:  "I shot the sheriff, but in my case it was the deputy."[3]

Carol Barnett, a Pecos County jailer, testified that a razor blade that had been removed from its plastic holder was taken from the sink in Smith's cell.  She also testified that after a strip search of the inmates and a shakedown of the maximum security cells, Smith got angry because his cell had been searched.  He tore up light fixtures and a television set and threw the pieces through the bars at the deputies, and then started a fire with a blanket.  She testified that Smith was more aggressive than most of the other inmates.

Darlene Archer, another jailer, testified that she saw Smith hitting another inmate in the face with his fist; and that she heard Smith singing, in a cheery manner, "I shot the sheriff, but

---

[3]Apparently Smith sang his own version of the song written by Bob Marley and recorded by Eric Clapton, entitled "I Shot the Sheriff."  The complete lyrics, as written by Mr. Marley, are available at http://www.bobmarley.com/songs/songs.cgi?sheriff (last viewed October 24, 2006).

11

in my case I shot the deputy." In her opinion, Smith had "no good points" and "no redeeming virtues."

Bruce Wilson, Sheriff of Pecos County, testified that he came to the jail the night Smith started the fire and heard Smith say, "The first son of a bitch through that door I'm going to kill." He testified that Smith was moody and one day could be docile and the next day "he can be a raging, crazy human being." He testified that Smith is "very dangerous" and was the dominating force in the maximum security area of the Pecos County Jail.

Several other witnesses testified that Smith had a bad reputation for being a peaceful and law-abiding citizen.

Smith rested without presenting any evidence at the 1999 trial. In cross-examination of the State's witnesses and in closing argument, Smith's counsel attempted to show that Smith shot at Officer Hudson's car to try to avoid capture rather than to deliberately take his life. He also argued that Smith had changed in the twelve years since the murder, and stressed the fact, brought out on cross-examination, that Smith had not used any of the weapons described by the State's witnesses against jailers or other inmates.

In his affidavit presented in the state and federal habeas proceedings, Smith's counsel explained his decision not to present any evidence at the 1999 trial as follows:

> I, after discussing the matter with CHARLES SMITH, decided upon the strategy of reducing the quantity of damaging evidence

12

both as to future dangerousness and mitigation by resting with the State. This was the third time through the punishment phase, and there was a wealth of bad information which I knew the State would present to this third jury either through cross examination of defense witnesses or in rebuttal. Comparing the predictive beneficial effect of our presentation with the damaging effect of the State's yet-to-be-presented evidence, I was convinced th[at] we would come closer to avoiding the death penalty by that strategy than any other. This really wasn't just speculation -- I had seen the evidence weighed before, twice. I believed then and I believe now, that there was no way our evidence would benefit our changes enough to anywhere offset the additional damaging State's evidence that would follow via cross examination and rebuttal.

C

Smith acknowledges that Underwood is an experienced criminal defense attorney, well qualified to represent persons accused of capital offenses. He contends, however, that Underwood's decision to forego further investigation and to present no evidence at the punishment phase of the third trial is a "flawed strategy" representing a serious departure from professional norms. Smith contends that counsel's representation was constitutionally ineffective because he failed to present (1) expert testimony from Dr. Windel Dickerson, Dr. James Marquart, and Dr. Walter Quijano; (2) the testimony of Smith's mother, half-sister, aunt, and cousin; (3) Smith's testimony; and (4) juvenile offense and jail records.

(1)

(a)

13

Dr. Dickerson, a psychologist, was called as an expert witness for the defense at the punishment phases of Smith's first and second trials in 1989 and 1992. He testified that he performed psychological tests on Smith that revealed problems in his intellectual functioning, commonly associated with some kind of underlying organic brain injury. Dr. Dickerson concluded that Smith suffers from a chronic brain dysfunction that was probably caused by a head injury Smith sustained when he was struck by a car while riding his bicycle when he was 13 years old. Smith's medical records indicated that he had an abnormal electroencephalogram that indicated a possible seizure disorder. Doctors prescribed Dilantin for Smith to control his severe headaches, but he did not take it regularly. Although Dr. Dickerson did not interview Smith's family, he testified that he believed that Smith had either experienced abuse or witnessed it. He testified that Smith had a chaotic upbringing: his natural father had been sent to prison; his mother had married many times; and the family lived on welfare. According to Dr. Dickerson, Smith was exceedingly self-centered, and had a great impairment in terms of impulse control that had at least a partial organic basis. He testified that the results of Smith's Minnesota Multiphasic Personality Inventory revealed that Smith is a profoundly disturbed person who has little regard for others, has trouble conforming his behavior to the rules of society, and acts aggressively out of fear.

14

In 1989, Dr. Dickerson testified that Smith is an appreciable risk to commit future acts of violence and that he "needs to be restrained in some way for our protection and his." At the second trial in 1992, Dr. Dickerson compared the results of psychological tests performed on Smith in 1992 to the results of the 1989 tests and concluded that Smith was a much more passive individual in 1992, somewhat moderating the risk of future dangerousness. He further testified that Smith had not committed any violent acts during the time between the first and second trials. He acknowledged, however, that Smith was still a significant risk and that he "has still got a ways to go." He testified further that there is a progressive dimension of risk level associated with violent conduct with the passage of time and that, if Smith received proper treatment in prison, there was a realistic possibility that he could become a useful member of prison society. He also agreed that past behavior is the single best predictor of future dangerousness.

(b)

Dr. Marquart was called as an expert witness for the defense at the punishment phase of Smith's second trial in 1992. He testified that, based on his research, he had concluded that it would be statistically impossible to determine whether an individual would be a continuing threat to society and that long-term predictions of violence could not be accomplished with any degree of accuracy.

15

(c)

Dr. Quijano, a psychologist, did not testify at either of Smith's first two trials. In support of his state and federal habeas petitions, Smith presented Dr. Quijano's affidavit. Dr. Quijano states that, based on his review of Smith's history and records, he believes that Smith would have been placed in administrative segregation if he had been sentenced to life in prison. He states that, if he had been called as a witness at Smith's third punishment trial, he would have testified that the probability would be low that Smith would be a future danger to society, based on the fact that Smith was not violent while in the Kansas correctional facility and his non-violent behavior in the Texas Department of Criminal Justice. He states that Smith's violent conduct in the Pecos County Jail was an "anomaly" and might have occurred because the law enforcement officers in Pecos County, who were friends with the victim, may have goaded Smith into losing his temper in order to provide evidence of future dangerousness at trial so as to ensure that Smith received the death penalty.

(2)

Smith asserts that his mother, half-sister, aunt, and cousin were present and willing to testify at his third punishment trial in 1999. All of them submitted affidavits in the state and federal habeas proceedings, stating that if they had been called to testify, they would have expressed their love for Smith and pleaded for mercy on his behalf, and would have testified about his head

16

injury and subsequent impaired intellectual functioning, his impoverished and disadvantaged upbringing, and his positive character traits.

(3)

Smith submitted an affidavit in which he states that, if he had been called as a witness at the 1999 punishment trial, he would have testified that he was only 22 years old at the time of the murder; he had consumed 30 beers in a 22-hour period and was intoxicated at the time of the shooting; his prior accident caused him to have headaches and seizures and he was prescribed Dilantin; he had had more than ten years to think about the crime and is very remorseful; he has a good disciplinary record in prison; and he believes that the officers at the Pecos County Jail baited him to act violently in order to increase the likelihood of his receiving the death penalty.

(4)

Smith contends that other evidence not previously presented "apparently either [was] not discovered or used by trial counsel in formulating the strategy to present no evidence at punishment." This evidence consists of Smith's records from the Texas Department of Criminal Justice, his jail records from Pecos County and Crockett County, and portions of his juvenile record.

D

The state habeas court found that the defense decision to rest without presenting any evidence at the 1999 punishment trial was a

17

matter of sound trial strategy based on trial counsel's previous experience in the 1989 and 1992 punishment trials. The court rejected as unfounded Smith's claim that counsel did not conduct the necessary investigation on which to base a rational, informed decision of whether to call witnesses. The court found that, by not presenting testimony, Smith's counsel was able to prevent the prosecution from presenting other damaging evidence to the jury, including:

> a. The fact that [Smith] had been arrested six or seven times as a juvenile;
>
> b. The fact that [Smith] had been on juvenile probation three times;
>
> c. The fact that [Smith's] previous psychological reports indicated that [Smith] "had psychological testing which indicated that he was an impulsive, angry, inadequate feeling individual with tendencies toward acting out this anger. He was diagnosed as having a conduct disorder, undersocialized aggressive type when he was 14 years old. Basically, what that means is antisocial acts, acts against society, criminal type behavior. Undersocialized means that he was not socialized to the extent of dealing effectively with society, and aggressive type means as opposed to a passive type which is just stealing things of that nature, and aggressive type is active aggression against people. That was 1980, when he was 14 years old."

The state habeas court found that the prosecution could have used Dr. Dickerson's prior testimony that a person's past behavior is "the best single predictor" in predicting how violent a person might be in the future in cross-examining him had he been called as

18

a witness in 1999.  The court found that the prosecution could have cross-examined Dr. Marquart about the inconsistency between his 1992 testimony that accurate long-term predictions of violence are impossible and his prior testimony in another case that older inmates are less likely to engage in violent activity in prison. It also found that, if Dr. Quijano had been called as a witness for the defense, the State could have cross-examined him about his prior testimony in another case that the "best" and "strongest" indicator of whether someone would commit crimes in the future is their prior record of criminal actions.

Furthermore, the court found that trial counsel's strategic decision not to present evidence regarding Smith's chaotic upbringing, his diagnosis of attention deficit disorder, and the role of his head injury and failure to take Dilantin was sound, because if such evidence had been presented, it would have opened the door to the State calling Dr. Richard Coons as an expert witness in rebuttal.  The court found that, if Dr. Coons had been called as a witness, he would have rebutted Smith's mitigating evidence and would have testified, as he did in the prior trials, that he did not think Smith's head injury had anything to do with his behavior.  At the first two trials, Dr. Coons, a psychiatrist, testified that, in the light Smith's history and the facts of the crime, there was a probability that Smith would constitute a future danger.  In his previous testimony, Dr. Coons observed that Smith's family had financial problems and that he had a deprived

19

upbringing; that Smith had been diagnosed at age 14 as an undersocialized aggressive type; that he had been placed on juvenile probation three times and had been charged as a juvenile on six occasions; that he had been diagnosed with attention deficit disorder with hyperactivity, which can lead to behavioral problems as an adult; and that Smith's prior behavior, psychological and psychiatric assessments, social history, and family background did not change his mind about Smith's future dangerousness, but instead reinforced his assessment. Dr. Coons testified that he did not believe that Smith's head injury had anything to do with his behavior.

The state court found that counsel's decision not to call Smith's mother as a witness was sound because she had told investigator Larry Jackson that she was not surprised that Smith had killed someone, and Jackson would have been available to testify at the 1999 trial in rebuttal had Smith's mother been called as a witness.

E

The state court's decision is neither contrary to, nor an unreasonable application of, Strickland. Most of the evidence that Smith contends should have been presented at the 1999 trial, including his own testimony, had been presented at the 1989 and 1992 trials. Smith's counsel, who represented him at all three trials, was well aware that the defense evidence did not persuade the juries in those trials to spare his life, even in the 1992

20

trial when the jury was instructed to answer a special issue on mitigating circumstances. Smith's family members did not testify at the two previous trials, but the information they could have provided regarding Smith's family background and his head injury was presented to the juries at those trials through Dr. Dickerson's testimony. Although Smith argues that his counsel should have called Dr. Dickerson to provide updated testimony at the third trial in 1999, Smith did not furnish an updated report from Dr. Dickerson in the habeas proceedings. Therefore, he offers only speculation that Dr. Dickerson could have provided helpful testimony in 1999. Dr. Marquart did not evaluate Smith and could not have provided the jury with any information specific to Smith. As the state court observed, all three experts would have been subjected to damaging cross-examination by the prosecution based on their prior testimony, and the presentation of expert testimony by the defense would have led to rebuttal and more damaging evidence from the State's expert, Dr. Coons.

In the light of brutal and senseless nature of the crime, and all of the other evidence of Smith's violent conduct, it is unlikely that evidence of his head injury, his troubled childhood and chaotic upbringing, pleas for mercy from his relatives, or the jail and juvenile records that Smith says his counsel should have discovered and presented would have made any difference. If Smith's relatives had testified, they would have been impeached on cross-examination with information that Smith and his mother had

21

provided earlier to medical personnel and probation officers (regarding his head injury, his relationship with his father and stepfathers, and his use of alcohol and drugs) that contradicted statements in the family members' affidavits. As the district court noted, Smith did not submit as exhibits in the state or federal habeas proceedings the jail and juvenile records that he claims his counsel should have discovered and presented. Consequently, he has failed to demonstrate that the state court unreasonably concluded that he was not prejudiced by counsel's failure to discover and present those records to the jury.

III

The state court's decision that Smith's counsel made a reasonable strategic decision to forego the presentation of evidence at the punishment phase is neither contrary to, nor an unreasonable application of, clearly established federal law. Therefore, the judgment of the district court denying Smith's petition for a writ of habeas corpus is

AFFIRMED.

22