IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 9, 2008

Charles R. Fulbruge III
Clerk

No. 07-70039

ROBERT JEAN HUDSON

Petitioner - Appellant

v.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:03-CV-1643

Before REAVLEY, SMITH, and BARKSDALE, Circuit Judges.

REAVLEY, Circuit Judge:[*]

Robert Jean Hudson was convicted of capital murder in a jury trial in
Texas and sentenced to death. The Texas Court of Criminal Appeals affirmed
the conviction and sentence on direct appeal, and Hudson unsuccessfully sought
both state and federal habeas relief. Hudson now seeks a certificate of
appealability (COA) to appeal the district court's denial of his 28 U.S.C. § 2254
petition. We DENY his request.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

## I. Background

At approximately 11:00 p.m. on May 6, 1999, Hudson telephoned Edith Kendrick, his ex-girlfriend. Hudson heard a man's voice in the background and suspected that Kendrick had another man in her apartment, which upset him. When he arrived at her apartment and knocked on the door she would not open it. Kendrick was inside the apartment with Michael Spearman. Hudson began yelling and kicking the door, saying that he was going to kill both of them. Hudson kicked the door open and saw Kendrick standing next to the bed and Spearman getting up from the couch while pulling his pants up.

Kendrick attempted to intervene between Spearman and Hudson, who began swinging a knife at her. Spearman ran out of a second exit and called 911 from a pay telephone.

As Hudson was slashing Kendrick, her eight-year-old son Colby got between Hudson and his mother. Hudson inflicted severe cuts on Colby's throat, neck, and fingers, and the boy ran bleeding from the apartment. Kendrick fled to the stairs at the front balcony where Hudson stabbed her repeatedly.

Witness Michael Munoz testified that he saw the attack from his vehicle in the apartment parking lot. Munoz said he saw Kendrick come crashing out of the apartment onto the balcony, fall to her knees, and hit her head on the guardrail. According to Munoz, Hudson immediately followed, grabbed Kendrick's hair, and pulled her backwards. Munoz testified that while Kendrick was on her back Hudson stabbed her six to eight times and that he raised his arm as high as he could before stabbing her. Kendrick was left in a large pool of blood and died from the multiple stab wounds, three of which penetrated her heart. Each of the stab wounds would have been separately fatal.

Police arrived on the scene quickly and found Hudson at a nearby convenience store. They took him back to Kendrick's apartment where witnesses identified him. Inside the disarrayed apartment, police found blood splattered

all over and an open purse on the couch. Spearman told police that Kendrick's purse had contained cash and a new watch, and that it was not on the couch before Hudson arrived. At the police station, police found a ladies' watch and $275 with blood on it in Hudson's pocket. Police recovered the knife on the ground outside the apartment, and a witness who worked with Hudson testified that he had seen Hudson carrying a similar knife at work. After being given his Miranda warnings, Hudson signed a written statement confessing to Kendrick's killing.

At the punishment phase of trial, the state called only two witnesses. A fingerprint technician introduced evidence of Hudson's prior convictions, including burglary and a previous murder. A woman who worked at the jail commissary testified that Hudson had exposed himself and masturbated in front of her while he was being held pending trial. The defense called no witnesses at either the guilt/innocence or the punishment stage of trial.

## II. Standard of review

The Antiterrorism and Effective Death Penalty Act (AEDPA) requires a state habeas petitioner to obtain a COA before the petitioner may appeal the district court's denial of relief. 28 U.S.C. § 2253(c). A COA may be issued only if the petitioner "has made a substantial showing of the denial of a constitutional right." Id. § 2253(c)(2); see Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 1039 (2003). When, as in this case, the district court has rejected a petitioner's claims on the merits, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000). A petitioner "satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at

327, 123 S. Ct. at 1034. "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits. We look to the District Court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable amongst jurists of reason." Id. at 336, 123 S. Ct. at 1039.

## III. Discussion

Hudson raises three arguments on appeal. He argues that (1) the district court improperly applied the AEDPA's standard of deference to the state habeas court's findings; (2) his trial counsel rendered ineffective assistance by failing to investigate and present at the punishment phase mitigating evidence in the form of testimony from several family members; and (3) the Dallas County Sheriff's Department forcibly medicated him during trial, which prevented him from effectively assisting his counsel in his defense, interfered with his confrontation rights, and denied him due process of law. We consider each argument in turn.

## A. AEDPA deference

In the district court, Hudson argued that the court should not apply the presumption of correctness ordinarily afforded a state court's findings of fact, and instead should review his claims de novo. He reasoned that the state habeas court's findings were not entitled to deference because the state court had adopted verbatim the respondent's proposed findings of fact and conclusions of law without granting him a hearing. The district court found no merit to Hudson's claim and held that the presumption of correctness prescribed under the AEDPA for state court findings of fact did not depend on whether the state habeas court elected to hold an oral hearing.

In this court, Hudson challenges the district court's application of deference to the state court's determination. Under the AEDPA, a state court's adjudication of an issue on the merits is entitled to deference. See Hill v.

Johnson, 210 F.3d 481, 485 (5th Cir. 2000). Federal courts will defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Moreover, a state court's factual findings are presumed correct unless the petitioner rebuts the findings with clear and convincing evidence. § 2254(e)(1). The AEDPA's deferential scheme is mandatory and applies to all claims adjudicated on the merits in state court. Valdez v. Cockrell, 274 F.3d 941, 950 (5th Cir. 2001) At the COA stage, this court asks "whether the District Court's application of AEDPA deference . . . was debatable amongst jurists of reason." Miller-El, 537 U.S. at 341, 123 S. Ct. at 1042.

The district court correctly held that deference does not require an oral hearing in the state court. "We have consistently recognized that, to be entitled to the presumption of correctness, a state court need not hold an evidentiary hearing; to the contrary, findings of fact based exclusively on affidavits are generally sufficient to warrant the presumption." Carter v. Johnson, 131 F.3d 452, 460 n.13 (5th Cir. 1997). Hudson argues that Carter is inapplicable here because the only affidavits before the state habeas court were those that he presented purportedly reflecting trial counsel's failure to investigate mitigating evidence. However, a state habeas judge's findings may be entitled to deference even after a paper hearing when the same judge presided over both the trial and habeas proceedings. Armstead v. Scott, 37 F.3d 202, 208 (5th Cir. 1994). This was case here. The state habeas judge was able to evaluate Hudson's numerous state habeas claims, including whether Hudson's affidavits sufficiently showed that counsel should have discovered and offered the specified mitigating evidence, informed by the court's knowledge of the trial proceedings and defense

5

counsel's performance at trial. The lack of an oral hearing in state court thus does not defeat the presumption of deference in this case. See Valdez, 274 F.3d at 951 (holding that "a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review").

Hudson's assertion that deference was not required because the state court adopted the respondent's proposed findings and conclusions is similarly without merit. In Trevino v. Johnson, 168 F.3d 173, 180 (5th Cir. 1999), a state prisoner claimed that his due process rights were violated because the trial court adopted the state's proposed findings of fact only three hours after they were filed in the court. We denied the petitioner a COA, concluding that a claim of infirmity in the state habeas proceeding does not present a constitutional ground for relief in federal court. Id. Hudson argues that the district court erroneously relied on Trevino to reject his argument against deference because he is not making a due process claim. Rather, he asserts that the state habeas court's adoption of the respondent's proposed findings of fact undermines whether deference should be accorded to the findings. He cites no authority in support of his assertion. More importantly, Hudson makes no showing that the state habeas court failed independently to consider and evaluate the state's proposed findings before adopting them as its own. The state habeas court's adjudication on the merits was entitled to deference under the AEDPA. See Valdez, 274 F.3d at 950. Hudson fails to show that reasonable jurists would find the district court's application of deference debatable. See Miller-El, 537 U.S. at 341, 123 S. Ct. at 1042.

## B. Ineffective assistance of counsel

Hudson next argues that his trial counsel rendered ineffective assistance at the punishment phase of trial because counsel failed to conduct a meaningful investigation into his background to discover mitigating evidence and failed to

present such evidence in mitigation. Hudson asserts specifically that counsel should have interviewed four of his family members: Clyde Crawford, his half-brother; Doris Walker, his cousin; Emmitt Williams, his father, who was incarcerated at the time of trial; and Lillie H. Walker, another unspecified relative. Although Hudson acknowledges that counsel talked to Crawford and Doris Walker, he argues that counsel did not ask any of the four relatives about his background.

The Sixth Amendment guarantees defendants the right to the effective assistance of counsel. Sonnier v. Quarterman, 476 F.3d 349, 356 (5th Cir. 2007). To obtain habeas relief on grounds of ineffective assistance, a petitioner must show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). A failure to establish either deficient performance or prejudice defeats the claim. Id. at 697, 102 S. Ct. at 2069.

To demonstrate deficiency, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687, 104 S. Ct. at 2064. To demonstrate prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. The court must "reweigh the evidence in aggravation against the totality of the available mitigating evidence." Wiggins v. Smith, 539 U.S. 510, 534, 123 S. Ct. 2527, 2542 (2003). "[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S. Ct. at 2069.

Hudson argues that defense counsel failed to investigate his mental health. He contends that his four family members were available to testify and would have testified about his childhood problems with anger management, the fact that he was raised by extended family members, his mother's psychological problems, and his lack of a close relationship with his father. He contends that he had behavioral problems as a child for which he was prescribed medication to control his anger and that this information should have been discovered and presented by counsel as mitigating evidence.

An allegation of deficient performance of counsel is measured against an objective standard of "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688, 104 S. Ct. at 2065. "Generally accepted standards of competence require that counsel conduct an investigation into petitioner's background." Smith v. Quarterman, 515 F.3d 392, 405 (5th Cir. 2008). A reasonable investigation may include inquiring about the client's "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." Wiggins, 539 U.S. at 524, 123 S. Ct. at 2537 (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.8.6(C), at 133 (1989) (emphasis removed)). We have recognized that, under the ABA Guidelines, counsel should present "all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence." Smith v. Quarterman, 471 F.3d 565, 570 (5th Cir. 2006) (quotation marks and citation omitted).

Hudson included with his state and federal habeas petitions affidavits from his four family members, all of whom provided similar information about his childhood and averred that they were available to testify but were never asked by counsel about Hudson's background. We need not decide whether counsel's failure to investigate these family members and discover the

8

information contained in the affidavits would rise to the level of deficient performance because this information lacks significance. Furthermore, Hudson testified outside the presence of the jury that he agreed with defense counsel's strategy not to present any witnesses at the punishment phase of trial. Hudson also acknowledged that counsel had spoken with several members of his family, but it is not clear from the record with whom counsel spoke.

A review of the affidavits and the totality of the evidence at trial fails to reveal the requisite prejudice to Hudson due to any deficiencies in counsel's failure to investigate or present the evidence of Hudson's background. Hudson's half-brother, Crawford, averred that as a child Hudson lived with his father's grandparents and also with Crawford and the boys' mother. He averred that Hudson had a normal childhood and that Hudson was courteous and respectful. He further stated that Hudson graduated from high school and went to college. He stated that Hudson was always employed, that Crawford introduced the victim to Hudson, and that Hudson got along well with the victim and with her children. Finally, he stated that Hudson had a good job at the time of his arrest and was well-liked.

Doris Walker, Hudson's cousin, averred that Hudson's mother was killed by a hit and run driver in 1992[1]; that Hudson was raised by his grandparents and aunts, as well as by his mother and Walker; that Hudson received unspecified psychiatric care and medication in elementary school "to control his behavior"; that Hudson's mother had unspecified psychiatric problems and "would become hysterical at times"; that Hudson had no trouble finding work and had a good job at the time of his arrest in this case; and that prior to Hudson's arrest, the victim had called her home looking for Hudson.

---

[1] The record shows that Hudson was born on March 4, 1963, and therefore was 29 years old in 1992.

Williams averred that he was Hudson's father; that his great grandparents raised Hudson because he was too young and Hudson's maternal grandparents did not want Hudson; that his great grandparents gave Hudson "a good Christian home"; that he was drafted into the Army and served in Vietnam, after which he developed drug and alcohol problems leading to his incarceration, and he became withdrawn from his son; that he had little contact with Hudson; that he was aware Hudson was prescribed medication to control "his problem managing his anger"; that the medication helped Hudson and was taken until Hudson graduated from high school; that when Hudson's great great grandmother died at about the time he graduated high school, Hudson became more withdrawn and began getting into trouble with the law; that Hudson lived with him for about a year and then went to live with Hudson's mother, who died in 1986[2]; that Hudson was an obedient and respectful child; and that Hudson appeared able to control himself when he was on medication.

Finally, Lillie H. Walker averred that she is related to Hudson, although she did not state the relationship; that she has known Hudson for most of his life; that Hudson's mother was killed in 1992; that Hudson was raised by his grandparents and his aunts, as well as by his mother and step-father; that when Hudson was in elementary school he received unspecified psychiatric care and took unspecified medication "to control his behavior"; that Hudson's mother had "psychiatric problems and would become hysterical at times"; and that Hudson had no trouble finding work and had a good job at the time of his arrest.

The state habeas court held that counsel's performance in failing to discover and present this evidence caused no prejudice to Hudson. It found that evidence of Hudson's anger management issues would have been ineffectual because the anger issue did not appear severe or sympathetic, particularly in

---

[2] This is contrary to Walker's affidavit that Hudson's mother died in 1992. In any event, Hudson would have been 23 in 1986.

light of Hudson's "fairly stable upbringing through high school graduation." The court also found that the evidence of positive character traits from Hudson's family would have appeared biased and of minimal benefit. The state habeas court specifically found no prejudice because the mitigating evidence was minimal in its quality and volume and did not present a sympathetic case. The court held that the statements about Hudson's medication to control his behavior were general in nature, unsubstantiated, and did not indicate that behavioral problems constituted a severe psychological problem that rendered Hudson less morally culpable. The state court concluded that Hudson failed to show by a preponderance of the evidence that the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. The district court held that the state habeas court's finding that Hudson failed to demonstrate prejudice was not an unreasonable application of the Strickland standard.

We conclude that reasonable jurists would not find the district court's assessment of Hudson's claims debatable, Slack, 529 U.S. at 484, 120 S. Ct. at 1604, because we believe that there is no reasonable probability that the background information in Hudson's affidavits would have caused the jury not to vote for a death sentence. We have previously noted that our consideration of this issue is illumined, although not necessarily controlled, by a comparison with cases in which the Supreme Court has determined that counsel's failure to discover and present mitigating evidence likely would have affected the outcome of the sentencing proceedings. Sonnier, 476 F.3d at 360; see Miniel v. Cockrell, 339 F.3d 331, 348 n.10 (5th Cir. 2003) (noting that mitigating evidence in petitioner's affidavits was mild in comparison with evidence supporting ineffective assistance claims in recent Supreme Court cases).

For example, in Wiggins, the petitioner's background evidence, which the Court characterized as "powerful," showed that the petitioner suffered severe

privation and abuse as a young child living with an alcoholic, absentee mother. 539 U.S. at 535, 123 S. Ct. at 2542. He and his siblings were frequently left alone and forced to beg for food and to eat paint chips and garbage. Id. at 517, 123 S. Ct. at 2533. He was physically tortured and beaten and repeatedly raped while in foster care. Id. at 535, 123 S. Ct. at 2542. The petitioner subsequently ran away from the abuse and began living homeless on the streets at a young age. Id. at 517, 123 S. Ct. at 2533. The Supreme Court called this the "kind of troubled history" that is relevant to assessing a defendant's moral culpability. Id. at 535, 123 S. Ct. at 2542. In light of the petitioner's "excruciating life history" and the absence of any record of violent conduct to offset the "powerful mitigating narrative," the Supreme Court concluded that there was a reasonable probability that the jury, confronted with evidence of the petitioner's background, would have returned a different verdict. Id. at 536–37, 123 S. Ct. at 2543.

Similarly, in Williams v. Taylor, 529 U.S. 362, 395–96, 120 S. Ct. 1495, 1514 (2000), the Supreme Court held that an attorney's decision not to present additional mitigating evidence was ineffective where the evidence included "voluminous" and "graphic[]" descriptions of the defendant's "nightmarish childhood." The evidence showed that the petitioner's parents had been imprisoned for criminal neglect; that the home had feces and urine on the floor and dirty dishes in the sink; that the children were dirty and without clothing; and that four of the children were found under the influence of whiskey. Id. The petitioner also had been repeatedly beaten by his father, had been placed in foster care while his parents were in prison, and was returned to their custody upon their release. Id. Moreover, the evidence showed that the petitioner was "'borderline mentally retarded.'" Id. at 396, 120 S. Ct. at 1514.

In Rompilla v. Beard, 545 U.S. 374, 391–92, 125 S. Ct. 2456, 2468 (2005), the Court held that counsel provided ineffective assistance by failing to discover

evidence of the petitioner's background showing that petitioner had been reared in a slum environment by severely alcoholic parents who physically and verbally abused him. The petitioner's parents kept him and his siblings isolated in a filthy home without indoor plumbing, forced him to sleep in an attic with no heat, and did not provide clothing for their children, who attended school in rags. Id. at 392, 125 S. Ct. at 2468–69. The petitioner also suffered from organic brain damage, fetal alcohol syndrome, and mental retardation. Id. at 392–93, 125 S. Ct. at 2469.

In contrast, Hudson's half-brother averred that Hudson had a normal childhood, graduated from high school, and attended college. Hudson's father stated that his great grandparents provided Hudson with a good home and that Hudson was an obedient and respectful child. Although the family members averred that Hudson took medication as a child to control his anger, the statements were non-specific and unsubstantiated by any medical records. Hudson averred in his own affidavit that he attended special education from second through eighth grade and that his mother could not provide him with a stable home after he went to live with her due to his grandmother's illness. However, the record shows that Hudson went on to attend college for at least two years as a drama major, and there were no allegations that Hudson was ever traumatized physically or verbally by his parents or by any one else. There also were no allegations that Hudson suffered any form of organic brain dysfunction or mental retardation. Although the affidavits alleged that Hudson's mother suffered vague psychiatric problems, Hudson reported on a psychological evaluation when he was first incarcerated in the Texas Department of Criminal Justice in 1986 that there was no family history of mental illness. Dallas County Jail psychiatric records show that Hudson suffered from depression and insomnia, but there is no report of a history of anger control issues.

Furthermore, unlike the petitioner in Wiggins, Hudson does have a prior history of violent acts because he previously pleaded guilty to murder.[3]

The evidence at trial showed that Hudson broke down the victim's door while yelling that he was going to kill Kendrick and Spearman. Hudson repeatedly slashed and stabbed Kendrick and pulled her back to continue stabbing her as she fled from him. Hudson also attacked and severely injured Kendrick's young son by cutting him several times on the throat and neck. Testimony showed that Hudson repeatedly raised his arm as high as he could before stabbing Kendrick, who suffered slashing and stab wounds to her arms, leg, and chest. Kendrick was left bleeding so profusely that blood pooled around her and dripped from the balcony of her apartment.

On balance, we cannot say that a reasonable jurist would find debatable or wrong the district court's conclusion that Hudson failed to show prejudice from counsel's failure to investigate his four family members and to discover and present their mitigating evidence. Hudson failed to show that his background presented a life history such that there is a reasonable probability that the jury would have found Hudson less morally culpable and imposed a sentence other than death. See Sonnier, 476 F.3d at 360–61; see also Woodford v. Visciotti, 537 U.S. 19, 26–27, 123 S. Ct. 357, 361 (2002) (reversing Ninth Circuit's judgment that California Supreme Court's decision was unreasonable where the state court held that mitigating evidence of petitioner's dysfunctional family, psychological abuse, low self-esteem, and depression would not have overcome aggravating factors of the crime and evidence of prior offenses).

Hudson also argues that defense counsel failed to investigate and introduce evidence that would have mitigated his criminal history. As noted

---

[3] To the extent that Hudson's affidavits purported to show that he maintained positive work habits and had a close relationship with the victim, the state habeas court correctly noted that counsel was able to elicit this information effectively during cross-examination of the state's witnesses at trial.

above, the state offered evidence at the punishment phase that Hudson had a prior murder conviction. The evidence was that Hudson had pleaded guilty to murder in 1987.[4] Hudson argues that his trial counsel should have introduced evidence showing that the charge in that prior murder case had been initially dismissed for lack of evidence and that the conviction was obtained after the case was refiled. He also asserts that counsel should have offered evidence that Hudson was not the shooter in the prior murder case. He argues that there was evidence that a co-defendant had pleaded guilty in the case as part of a plea bargain and that an affidavit for an arrest warrant attached to a prosecution report showed that the co-defendant had shot the victim. Hudson contends that this evidence of his extraneous conduct in the previous murder case would have been admissible and would have mitigated his involvement in that prior offense.

Hudson's argument is unpersuasive. Defense counsel did attempt to mitigate Hudson's role in the prior conviction. Counsel emphasized to the jury that although Hudson was previously convicted of murder, he received a sentence of just five years as part of a plea agreement with the state. Counsel also pointed out the failure of the state to introduce any facts about the prior case to show whether it was violent in nature. Counsel specifically noted that Hudson could have received this low sentence for merely driving a car as part of the offense.

Even assuming arguendo that counsel's performance was deficient because he should have discovered further evidence about the offense, Hudson does not show prejudice and does not demonstrate that the district court's rejection of this claim is debatable. Hudson pleaded guilty to the murder charge. In that case, the arrest warrant affidavit to which Hudson directs us shows that Hudson's fingerprints were found in the victim's apartment where the victim was killed

---

[4] Hudson states in his brief that he pleaded no contest to the charge. However, the judgment, which is dated June 12, 1987, shows that he pleaded guilty to the offense of murder.

and that Hudson's co-defendant admitted that he and Hudson were both involved in the crime.[5] In light of Hudson's guilty plea in the killing of another person, and his confession in the instant case, there is no reasonable basis to believe that the jury in this case would have felt inclined not to impose the death penalty for Kendrick's murder merely because Hudson did not pull the trigger when he was previously involved in taking another person's life. See Strickland, 466 U.S. at 695, 104 S. Ct. at 2069.

## C. Forced medication

Hudson next argues that the Dallas County Sheriff's Department forcibly medicated him during trial by prescribing four different drugs simultaneously, which had the effect of rendering him lethargic and unable to focus on the testimony or make rational decisions. He contends that the prescribed medication denied him his right to the effective assistance of counsel, his right of confrontation, and his right to due process.[6]

The state habeas court extensively reviewed Hudson's medical records from the Dallas County Jail, where Hudson was held awaiting trial. The state court noted that Hudson was first prescribed antidepressant medication in May 1999 after he complained to a jail psychiatrist about depression and an inability to sleep. Hudson's trial began on February 28, 2000. The state court found that in the months prior to and during Hudson's trial, he was prescribed in varying amounts the antidepressants Paxil, Trazodone, and Remeron, all of which are used to treat depression and can cause drowsiness, dizziness, confusion, fatigue, and/or abnormal dreams and thinking.

---

[5] We note also that the prosecution report to which the affidavit was attached stated that it was Hudson who kicked in the victim's door before the co-defendant shot the victim.

[6] Although we have previously expressed some uncertainty whether a claim of involuntary medication is cognizable in habeas, Richardson v. Johnson, 256 F.3d 257, 259 (5th Cir. 2001), we need not, and do not, resolve that question here.

The state court found, however, that Hudson failed to show these drugs were forcibly administered. Instead, the court recognized a notation in the medical records showing that Hudson was permitted to keep the medications on his person, suggesting that he was self-medicating. The court further found no evidence in the record that Hudson ever requested that the medication be discontinued. Although Hudson had on at least one occasion refused medical treatment by a nurse, there was no indication Hudson ever attempted to refuse his medication.

The state court also found no showing by Hudson that the medication harmed him. There was no evidence that Hudson ever complained to the medical personnel about excessive drowsiness or lethargy or that he was unable to think. Instead, the medical records showed that Hudson frequently complained about an inability to sleep. He reported that he would sleep for only a few hours each night and had been that way his whole life. Other medical notations showed that Hudson complained that the medication was having no effect on him. The state court found that just four days before trial started, Hudson reported sleeping only from 10:00 p.m. or 12:00 a.m. until 2:00 a.m. or 3:00 a.m. and that he engaged in only occasional day-time napping. Therefore, the court found incredible Hudson's claims that the medication incapacitated him.

The court also noted that defense counsel never expressed any concern about Hudson's competency during trial. Moreover, the court found that the record did not support Hudson's claim that the medication effectively prevented him from being present at trial, and the court quoted from a long colloquy between Hudson and defense counsel during voir dire showing that Hudson was consulted and actually participated in certain decisions to excuse prospective jurors. The court further noted that it did not observe Hudson to be sleepy during the trial. The court concluded that Hudson failed to show he could not

understand the proceedings and participate in his defense or that he was rendered incompetent due to his ingestion of medication.

The district court agreed that Hudson failed to show he was involuntarily medicated and failed to explain how he was affected by the administration of medication by the state. The district court found that Hudson offered no evidence to controvert the state court's findings, but merely asserted that because the medications were prescribed by the state while he was in state custody they were "in effect" involuntarily administered. The court concluded that the state habeas court's findings were supported by the record and were neither unreasonable nor contrary to Supreme Court law.

On appeal, Hudson argues that inmates have an interest in avoiding forcible ingestion of medication. He relies on Riggins v. Nevada, 504 U.S. 127, 112 S. Ct. 1810 (1992), and Washington v. Harper, 494 U.S. 210, 110 S. Ct. 1028 (1990). In Riggins, the Supreme Court held that the forced administration of antipsychotic medication during Riggins' trial, without a finding that the medication was medically appropriate and necessary for the defendant's safety or the safety of others, or that there were no less intrusive means available to obtain an adjudication of guilt or innocence, violated Riggins' due process rights. Riggins, 504 U.S. at 135–36, 112 S. Ct. at 1815. In Harper, the Court held that prison inmates have a due process liberty interest in avoiding the involuntary injection of antipsychotic drugs unless the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest. Harper, 494 U.S. at 227–28, 110 S. Ct. at 1039–40.

Here, Hudson continues to insist that his medication was forcibly administered. He asserts that his own affidavit and the jail medical records support his contention that he was "heavily medicated." He repeats his claim that the mere prescription of medication by jail medical staff results in a "coercive effect." Hudson cites no authority for this proposition, and he ignores

the evidence cited by the state court and the district court that the medication was prompted by Hudson's own complaints and that Hudson was allowed to keep the medication on his person, thereby suggesting that whether he took it was up to him. He offers no evidence whatsoever to contradict the state habeas court's finding in this regard. Although he claims that the prescription of medication by state agents shows that the medication was "in effect[] administered involuntarily," he ignores the evidence in the record that shows he knew how to refuse treatment. While in the Dallas County Jail Hudson signed a Refusal for Medical Assistance, declining to see the nurse. The same medical refusal form shows that a detainee could also refuse to take his prescription medication, which was not checked on the form. There is no evidence in the record that Hudson ever refused to take his medication or that he did not wish to take it.

Moreover, Hudson also ignores the evidence cited by the state court and the district court that he told the jail medical staff that the medication had no effect on him and that he had problems with insomnia his whole life. Hudson is correct that the dosages of the three medications were adjusted just before trial began. The record shows that on February 24, 2000, Hudson was prescribed 40 mg of Paxil, 30 mg of Remeron, and 200 mg of Trazodone to be taken daily. This represented an increase in the Paxil and Remeron and no change in the Trazodone. A note one month later in March 2000, however, states that while taking the same dosages of each drug Hudson still reported that his "sleep is poor" and that he has only "brief spells of sleeping" from midnight to 4:00 a.m. There is simply no indication in the record that Hudson's medication caused him to become sleepy, lethargic, or confused during his three-day trial, and Hudson offers nothing to contradict the findings of the state court or the district court.

Hudson also baldly asserts that the medication deprived him of the right to be present during his own trial. Mere conclusory allegations are insufficient to raise a constitutional issue in a habeas proceeding. Ross v. Estelle, 694 F.2d 1008, 1012 (5th Cir. 1983); see also Yohey v. Collins, 985 F.2d 222, 224–25 (5th Cir. 1993) (claims inadequately briefed are deemed abandoned on appeal). Moreover, Hudson ignores the state habeas court's extensive recitation of Hudson's colloquy with defense counsel during voir dire showing that Hudson discussed with counsel the defense's strategy and process for selecting jurors. At one point, Hudson indicated that he agreed defense counsel liked one prospective juror but that counsel had agreed with the state to excuse the juror because Hudson did not want the person on the jury. Hudson also twice indicated on the record that he agreed with counsel's strategy not to call defensive witnesses at the guilt/innocence and punishment phases of trial and that he also agreed that he would give up his right to testify in his own behalf. The colloquies with counsel show that Hudson was consulted during the voir dire and trial process and was able to participate in assisting with his defense.

Hudson fails to show that reasonable jurists would disagree with the district court's assessment of any of his claims or that his claims deserve encouragement to proceed further. See Miller-El, 537 U.S. at 327, 123 S. Ct. at 1034. Accordingly, we DENY Hudson's request for a COA.