**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 14, 2012

No. 11-70013

Lyle W. Cayce
Clerk

DOUGLAS ALAN FELDMAN,

Petitioner - Appellant

v.

RICK THALER, Director, Texas Department of Criminal Justice, Correctional
Institutions Division,

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, SMITH, and HAYNES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Petitioner-appellant Douglas Alan Feldman was convicted and sentenced
to death in Texas for the 1998 murders of Robert Everett and Nicolas Velasquez.
Feldman challenged his death sentence in habeas proceedings under 28 U.S.C.
§ 2254. The district court denied relief and Feldman now seeks a certificate of
appealability. We deny Feldman's request.

No. 11-70013

## I.

The facts of Feldman's crimes are essentially undisputed.[1]  Feldman was riding his motorcycle on the night of August 24, 1998 when Robert Everett, driving an eighteen-wheeler, suddenly passed Feldman and pulled into his lane, missing Feldman's left hand by inches.  Enraged, Feldman took out his firearm and fired several shots into the back of Mr. Everett's trailer.  Feldman then reloaded his weapon and pulled up alongside the cab of Mr. Everett's truck.  He fired several shots directly at Mr. Everett, killing him.

After returning to the scene of the crime to verify that Mr. Everett was dead, Feldman headed home.  Approximately 45 minutes after Feldman shot and killed Mr. Everett, and about eleven miles from the scene of the original shooting, Feldman passed an Exxon service station where Nicolas Velasquez, an Exxon tanker truck driver, was refilling the station's gas supply.  Feldman drove into the station and shot Mr. Velasquez twice in the back, killing him.  Feldman then returned home.

Over a week later, Feldman shot Antonio Vega while Mr. Vega was standing outside of a Jack-in-the-Box restaurant.  Mr. Vega was seriously injured but survived.  A bystander noted Feldman's license plate number and relayed the information to police.  When the police apprehended Feldman, they recovered two firearms and hundreds of rounds of ammunition.  Testing on one of the weapons and the shell casings found at the scene of the shootings of Messrs. Everett, Velasquez, and Vega confirmed that the weapon had been used at all three locations.

---

[1] Petitioner-Appellant's Brief in Support of Application for Certificate of Appealability at 3, *Feldman v. Thaler*, No. 11-70013 (5th Cir. Aug. 29, 2011).  The Texas Court of Criminal Appeals aptly summarized the relevant facts.  *See Feldman v. State*, 71 S.W.3d 738, 751–53 (Tex. Crim. App. 2002).

No. 11-70013

After his arrest but prior to trial, Feldman admitted committing the shootings to a police investigator, stating that they were the consequence of his traffic altercation with Mr. Everett. Feldman also testified to the shootings at his trial, noting that he had not forgiven Mr. Everett for his trespasses. Feldman explained that he had shot Mr. Velasquez because the man was standing beside an eighteen-wheeler, which caused Feldman to "explode[] again in anger."

Feldman was convicted of capital murder in a Texas trial court and sentenced to death on August 31, 1999. Feldman appealed to the Texas Court of Criminal Appeals ("the CCA"), which ultimately affirmed his conviction in a published opinion issued on February 20, 2002.[2] Feldman did not seek review by petition of certiorari in the United States Supreme Court.

While his direct appeal was still pending, Feldman filed for state habeas relief under Article 11.071 of the Texas Code of Criminal Procedure. In accordance with Article 11.071, the convicting state trial court received briefs and supplemental affidavits from both Feldman and the state. However, the court denied Feldman's request for an additional evidentiary hearing to develop facts related to his habeas claims. The convicting trial court then issued findings of fact and conclusions of law on Feldman's habeas claims,[3] which the CCA ultimately adopted in an unpublished opinion denying Feldman's request for habeas relief.[4]

Feldman filed his federal habeas petition on April 17, 2008. The district court denied both habeas relief and a certificate of appealability with respect to

---

[2] *See Feldman v. State*, 71 S.W.3d 738 (Tex. Crim. App. 2002).

[3] *See* Court's Findings of Fact and Conclusions of Law, *Ex parte Feldman*, 2007 WL 1139450, No. WR-66691-01 (Tex. Crim. App. Dec. 28, 2006).

[4] *See Ex parte Feldman*, No. WR-66691-01, 2007 WL 1139450, at *1 (Tex. Crim. App. Apr. 18, 2007).

No. 11-70013

all of Feldman's claims.[5]  Feldman now seeks to appeal three of the four claims the district court rejected.  First, Feldman argues that his death sentence violates his Sixth Amendment right to counsel, as his trial counsel rendered ineffective assistance by failing to present readily available evidence of Feldman's bipolar disorder.[6]  Next, Feldman claims that his trial denied him due process under the Fourteenth Amendment, as the trial judge refused to instruct the jury on the lesser-included offense of simple murder.[7]  Finally, Feldman claims that his trial denied him an impartial jury and due process in violation of the Sixth and Fourteenth Amendment, as the trial judge wrongfully excluded a qualified venire member merely because of her conscientious scruples about the death penalty.[8]

## II.

Before a § 2254 petitioner can appeal, he must obtain a certificate of appealability ("COA").[9]  To obtain a COA, the petitioner must make "a substantial showing of the denial of a constitutional right."[10]  Where, as here, "a district court has rejected the constitutional claims on the merits, . . . [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[11]  In death

---

[5] *See Feldman v. Thaler*, No. 3:07-CV-1284-P, 2011 WL 1666937, at *13 (N.D. Tex. 2011).

[6] Petitioner-Appellant's Brief, *supra* note 1, at 1.

[7] *Id.* at 2.

[8] *Id.* at 1–2.

[9] *See* 28 U.S.C. § 2253(c)(1)(A).

[10] *Id.* § 2253(c)(2).

[11] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

4

penalty cases, "any doubts as to whether a COA should issue must be resolved in the petitioner's favor."[12]

The CCA adjudicated all of the claims Feldman seeks to appeal on the merits. Consequently, the district court's review of Feldman's claims was governed by 28 U.S.C. § 2254(d) and (e). Under § 2254(d), the district court could not grant habeas relief unless the CCA's adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[13] Moreover, under § 2254(e)(1), which supplements § 2254(d)(2) with an "arguably more deferential" standard of review for state court findings of fact,[14] the district court was obliged to presume that the CCA's factual findings were correct unless Feldman furnished "clear and convincing evidence" otherwise.[15]

Hence, in determining whether a COA should issue in this case, the question is *not* whether reasonable jurists could debate the correctness of the CCA's rejection of Feldman's claims, but whether reasonable jurists could debate the district court's denial of habeas relief under the deferential standard of review mandated by § 2254(d) and (e).[16]

---

[12] *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (internal quotation marks and alterations omitted).

[13] *See* 28 U.S.C. § 2254(d).

[14] *Wood v. Allen*, — U.S. — , 130 S.Ct. 841, 849 (2010).

[15] *See* 28 U.S.C. § 2254(e)(1).

[16] *See Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005) ("In determining whether the district court's denial of [petitioner's] petition was debatable, we must keep in mind the deferential standard of review that the AEDPA requires a district court to apply when considering a petition for habeas relief.").

No. 11-70013

We examine Feldman's claims in turn and deny his request for a COA with respect to each claim.

## III.

Feldman seeks to appeal the claim that his conviction requires reversal under *Strickland v. Washington*, arguing that his trial counsel's failure to present readily available mitigating evidence of Feldman's bipolar disorder amounted to deficient representation.

To prove that a conviction requires reversal under *Strickland*, a petitioner must show both that his trial counsel's performance was deficient and that the defense suffered prejudice as a consequence.[17] To be cognizable under *Strickland*, trial counsel's error must be "so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment."[18] An error will meet this high standard if "counsel's representation fell below an objective standard of reasonableness."[19] However, because of the risk that hindsight bias will cloud a court's review of counsel's trial strategy, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."[20]

---

[17] *Cullen v. Pinholster*, — U.S. — , 131 S.Ct. 1388, 1403 (2011).

[18] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[19] *Id.* at 688.

[20] *Id.* at 689 (internal quotation marks omitted).

No. 11-70013

Our evaluation of the appealability of Feldman's ineffective assistance claim requires a brief foray into the facts of the state proceedings below.[21] In anticipation of the punishment phase of Feldman's trial, his defense counsel, James Oatman, retained a forensic psychiatrist and a psychologist to evaluate Feldman's mental condition.[22] Feldman was uncooperative during the evaluation and the experts were unable to render a diagnosis.[23] Concluding that the evaluation produced no mitigating evidence and actually disclosed facts harmful to Feldman, Mr. Oatman did not introduce evidence of the evaluation at trial.[24]

Nevertheless, Mr. Oatman's mitigation strategy rested on proving that Feldman had some form of mental deficiency that rendered him incapable of controlling his conduct.[25] To make his case, Mr. Oatman relied on vague appeals to circumstantial evidence.[26] Unsurprisingly, the prosecution rejoined that if

---

[21] *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) ("The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits.").

[22] Court's Findings of Fact and Conclusions of Law, *supra* note 3, at 16–17.

[23] *Id.* at 21.

[24] *Id.* at 21–22.

[25] Mr. Oatman argued that because Feldman "had been a successful, contributing member of society from 1979 to 1993 . . . his mental-health problems were the only way to explain his subsequent descent into lawlessness." *See* Court's Findings of Fact and Conclusions of Law, *supra* note 3, at 25. Mr. Oatman also claimed that Feldman "had inherited his mother's mental-health problems," reasoning that otherwise "there was no rational explanation for his behavior." *Id.*

[26] Mr. Oatman's evidence included: (1) testimony from Feldman's mother that Feldman "was a runaway child and that he suffered emotional and physical abuse from a hot-tempered father," *id.* at 22, (2) a 1993 memorandum written by Feldman to his attorney, in which Feldman "exhibits what can only be described as extremely paranoid thought patterns," *id.* at 23, and (3) a December 2007 letter from Feldman to his mother in which he "states that he feels like he is becoming a mental case, that noises bother him, that he has insomnia, and that he cannot concentrate or read well anymore," that "he is slowly drowning, unrealistically euphoric one moment and then narcissistically depressed the next," that "he is continually

7

No. 11-70013

Feldman truly suffered from a mental disorder, Mr. Oatman would have presented expert testimony.[27] The prosecution also averred that if Feldman *did* suffer from any mental instability, it was due to his own voluntary drug use.[28]

In the subsequent habeas proceedings before the CCA, Feldman submitted evidence that Dr. Jeffrey Glass had diagnosed him with bipolar II disorder in 1997, about one year before the murders for which Feldman was convicted.[29] Feldman also submitted evidence that his mother, Cecile Borshaw, had informed Mr. Oatman's investigator of Dr. Glass's 1997 diagnosis prior to trial, in accordance with Mr. Oatman's instructions to provide the investigator with all information relevant to the defense.[30] Finally, Feldman introduced evidence of a post-conviction Bipolar I diagnosis obtained by his habeas counsel.[31] In its answer, the prosecution submitted an affidavit from Mr. Oatman in which he generally explained his trial strategy but made no mention of the 1997 diagnosis.[32]

---

being set up," that "people do not respect the things he says and laugh at him behind his back," that "the world seems to be driving him insane just for fun and enjoyment," and that "he is slowly losing the ability to take care of himself," *id.* at 24–25.

[27] *See* Reporter's Record, vol. 41, at 74, *Feldman v. State*, 71 S.W.3d 738 (Tex. Crim. App. Jan. 12, 2000).

[28] *See id.* at 74–76.

[29] The evidence consists of unsigned notes apparently written by Dr. Glass, dated December 11, 1997, diagnosing Feldman with bipolar II disorder. *See* Application for Writ of Habeas Corpus, *Ex parte Feldman*, No. WR-66691-01, 2007 WL 1139450, Exhibit D, Progress Notes of Dr. Jeffrey Glass (Tex. Crim. App. May 29, 2001).

[30] *See id.*, Exhibit E, Affidavit of Cecile Borschow.

[31] *See id.*, Exhibit B, Affidavit of Dr. Paula Lundberg-Love, Ph.D. In her affidavit, Dr. Lundberg-Love states that she believes Feldman suffers from Bipolar I disorder and indicates that she bases her diagnosis in part on her review of Dr. Glass's records. *See id.*

[32] *See* State's Original Answer to Application for Writ of Habeas Corpus, *Ex parte Feldman*, No. WR-66691-01, 2007 WL 1139450, Exhibit A, Affidavit of Jim Oatman (Tex. Crim. App. Nov. 9, 2001).

No. 11-70013

On the basis of this new evidence, Feldman claimed that Mr. Oatman's failure to procure and present expert testimony confirming Feldman's bipolar disorder constituted deficient representation under *Strickland*. Pointing to the post-conviction Bipolar I diagnosis obtained by habeas counsel and the pre-conviction Bipolar II diagnosis rendered by Dr. Glass, Feldman argued that Mr. Oatman clearly could have found a favorable expert had he been diligent.[33]

The CCA rejected Feldman's theory of deficiency, concluding that Feldman failed to overcome *Strickland*'s "strong presumption" that trial counsel's representation was reasonable.[34] The CCA reasoned that Mr. Oatman had diligently sought an experienced team of mitigation experts to evaluate Feldman's mental health, and that Mr. Oatman's representation was not deficient under *Strickland* merely because he did not "canvas the field to find a more favorable defense expert."[35] Moreover, it reasoned that Mr. Oatman's decision not to obtain further evaluations could have been a reasonable strategic choice: even if he had been able to obtain a diagnosis akin to that obtained by Feldman's habeas counsel, the diagnosis would have been "double edged," demonstrating Feldman's future dangerousness.[36]

In the district court, Feldman argued that the CCA had erred for two reasons. First, he obliquely reasserted that reasonable trial counsel would have

---

[33] *See id.* at 43–44, 48.

[34] *See* Court's Findings of Fact and Conclusions of Law, *supra* note 3, at 19, 26–27. The CCA also determined that Feldman could not show prejudice in light of the overwhelming evidence of his guilt and prior bad acts. *See id.* at 37–46. We do not address the correctness of the CCA's prejudice determination in this opinion, as the district court upheld the CCA's opinion on the threshold ground that its deficiency determination was reasonable. *See Feldman v. Thaler*, 2011 WL 1666937, No. 3:07-CV-1284-P, at *19–20 (N.D. Tex. 2011).

[35] *See* Court's Findings of Fact and Conclusions of Law, *supra* note 3, at 20 (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000)).

[36] *See id.* at 33.

managed to procure and present a favorable mental health evaluation.[37]  In the alternative, he argued that Mr. Oatman still clearly erred by failing to introduce existing evidence of the 1997 diagnosis rendered by Dr. Glass.[38]

The district court rejected both of Feldman's theories of error under § 2254(d).  First, it upheld as reasonable the CCA's conclusion that *Strickland* was not triggered by Mr. Oatman's failure to seek additional evaluations.[39]  Second, it concluded that Feldman's novel argument relating to the 1997 diagnosis ignored the "double edged" nature of the diagnosis as well as the fact that Mr. Oatman would have needed to find an expert willing to sponsor the diagnosis to present it to the jury.[40]

In his petition for a COA, Feldman claims that the district court erred in its analysis relating to Dr. Glass's 1997 diagnosis.[41]  Perhaps wisely, he does not resuscitate his claim that Mr. Oatman unreasonably failed to find an expert willing to render a new diagnosis.[42]  Consequently, we address only the former argument in this opinion.

At first blush, it appears  difficult to reconcile Mr. Oatman's omission of the 1997 diagnosis with his mitigation strategy, particularly in light of the prosecution's response.[43]  However, *Strickland* requires a reviewing court "not

---

[37] *See* Brief in Support of Petition for Writ of Habeas Corpus, *Feldman v. Thaler*, No. 3:07-CV-1284-P, 2011 WL 1666937 (N.D. Tex. Apr. 17, 2008), at 19.

[38] *See id.* at 22–23.

[39] *See Feldman v. Thaler*, No. 3:07-CV-1284-P, 2011 WL 1666937, at *11 (N.D. Tex. 2011).

[40] *See id.*

[41] *See* Petitioner-Appellant's Brief, *supra* note 1, at 34–36.

[42] *See id.* at 6–7, 32–40.

[43] The district court suggested that Mr. Oatman could have omitted the 1997 diagnosis as "double edged" evidence that tended to demonstrate Feldman's future dangerousness, but

simply to give [Mr. Oatman] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons [he] may have had for proceeding as [he] did."[44] In this case, there are at least two plausible grounds for Mr. Oatman's omission.[45] First, Mr. Oatman might have reasonably feared that introducing evidence of the 1997 diagnosis — which, as Feldman acknowledges, would have required the assistance of an expert sponsor[46] — posed too great a risk of damaging cross examination by the prosecution.[47] More importantly — and as

---

Mr. Oatman's mitigation evidence already risked the boomerang effect to which the district court alludes. *See supra* nn. 25–26. Indeed, as then-Judge McConnell of the Tenth Circuit suggested in a 2008 opinion, while presenting generalized evidence of a defendant's mental disorder risks merely underlining his future dangerousness, introducing evidence of a specific diagnosis — particularly of a treatable condition like bipolar disorder — can avoid this danger by demonstrating that defendant's disorder is remediable with appropriate medication. *See Wilson v. Sirmons*, 536 F.3d 1064, 1093–94 (10th Cir. 2008).

[44] *See Cullen v. Pinholster*, 131 S.Ct. 1388, 1407 (2011) (internal quotation marks and citations omitted).

[45] It bears mentioning that Mr. Oatman was a veteran criminal defense lawyer at the time he represented Feldman, having served as lead counsel in hundreds of jury trials. *See* State's Original Answer to Application for Writ of Habeas Corpus, *supra* note 32, Exhibit A, Affidavit of Jim Oatman. Before Mr. Oatman became a defense attorney, he spent nine years as a Dallas County Assistant District Attorney. *Id.* Mr. Oatman has prosecuted and defended a number of death penalty cases. *Id.*

[46] *See* Petitioner-Appellant's Brief, *supra* note 1, at 36, 39; *see also* Richard G. Dudley, Jr. & Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 Hofstra L. Rev. 963, 984 ("Rendering a diagnosis . . . is virtually never a sufficient response to the legal question(s) presented to a mental health expert who testifies [in a death penalty case]. Although supplemental experts might only be asked to render or confirm a specific diagnosis, at least one of the mental health experts will need to then link that diagnosis to the legal questions posed."); John M. Fabian, *Death Penalty Mitigation and the Role of the Forensic Psychologist*, 27 Law & Psychol. Rev. 73, 80, 87 (2003) (emphasizing that death penalty counsel seeking to use a defendant's mental disorder as mitigating evidence must have an expert to define and explain the diagnosis to the jury and associate it with the defendant's crime).

[47] For example, cross-examination could have revealed the potentially harmful fact that Feldman refused medication after his 1997 diagnosis. *See* Court's Findings of Fact and Conclusions of Law, *supra* note 3, at 16–17; *cf. Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006) (holding that trial counsel reasonably omitted mitigating expert testimony, as the expert "would have been subject to damaging cross examination"); Paul J. Bruno, The

11

No. 11-70013

Feldman conceded in habeas proceedings before the CCA — putting an expert on the stand to explain the diagnosis would have opened the door to the prosecution to bring in its own expert on rebuttal.[48]   As Mr. Oatman's own experts could not make a favorable diagnosis, he would have been foolhardy to ignore the risk that the prosecution could produce an adverse expert.[49]

In light of the sparse record evidence on the circumstances surrounding Mr. Oatman's omission of the 1997 diagnosis, the CCA was plainly justified in

Mitigation Specialist, Champion Magazine, June 2010, at 26, *available at* http://www.nacdl.org/Champion.aspx?id=14626  (noting that putting a mitigation specialist on the stand will generally "open up his or her entire work product to discovery by the prosecution" and may expose the expert to damaging cross-examination.)

In this regard, we note that Feldman never claims Dr. Glass would have been available to testify to his 1997 diagnosis at trial.  *See* Petitioner-Appellant's Brief, *supra* note 1, at 35–36, 39.  Indeed, Feldman's brief appears to concede that trial counsel would have had to obtain a different expert to sponsor the diagnosis.  *See id.*

[48] *See* Application for Writ of Habeas Corpus, *supra* note 29, at 52; *Soria v. State*, 933 S.W.2d 46, 54 (Tex. Crim. App. 1996) ("By introducing psychiatric testimony obtained by the defense from a psychiatric examination of the defendant, the defense constructively puts the defendant on the stand and therefore the defendant is subject to psychiatric examination by the State in the same manner." (quoting *Battie v. Estelle*, 655 F.2d 692, 702 n. 22 (5th Cir. 1981))); *Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006) (holding that trial counsel reasonably omitted mitigating expert testimony, as the expert "would have been subject to damaging cross examination," and as it "would have led to rebuttal and more damaging evidence" from the state); *see also* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.11.G (rev. ed. Feb. 2003)  ("In determining what presentation to make concerning penalty, counsel should consider whether any portion of the defense case will open the door to the prosecution's presentation of otherwise inadmissible aggravating evidence.").

[49] Indeed, on January 16, 2001, shortly after Feldman's habeas counsel procured a Bipolar I diagnosis, a Texas Department of Corrections clinician administering a follow-up psychiatric evaluation concluded Feldman showed no signs of a mental disorder.  *See* State's Original Answer to Application for Writ of Habeas Corpus, *supra* note 32, Exhibit B, TDC Psychiatric Notes.  The clinician noted that "when told that [his habeas counsel's] tests had reportedly shown that he had a bipolar disorder [Feldman] was quite surprised and did not know why he was being called that."  *Id.*  After speaking with Feldman about his difficult childhood, his history of substance abuse and mental health issues, and his current life in prison, the clinician concluded: "no chronic symptoms of psychosis or emotional illness noted. Memory intact, no signs of mania and no signs of depression noted, cooperative, pleasant, groomed appropriately, thoughts goal directed.  Insight and abilities for reasoning and judgment are all within normal limits . . . no diagnosis."  *Id.*

12

concluding that Feldman failed to overcome *Strickland*'s "strong presumption" that Mr. Oatman's omission "might be considered sound trial strategy."[50] Because jurists of reason could not debate the district court's denial of habeas relief under § 2254(d), we deny Feldman's application for a COA on his ineffective assistance claim.

**IV.**

Feldman also seeks to appeal his claim that the trial court violated his Fourteenth Amendment rights under *Beck v. Alabama* by refusing to instruct the jury on the lesser-included offense of simple murder.

*Beck* invalidated an Alabama statute that created a blanket ban prohibiting trial judges in capital murder trials from instructing a jury on the lesser-included offense of felony murder, even if there existed evidence of the lesser crime.[51]    The Supreme Court reasoned that the statute created a constitutionally impermissible risk that juries would return guilty verdicts not because they had found a defendant guilty of a capital crime, but because they believed a defendant to be guilty of some lesser-included crime and felt that he should be punished rather than set free.[52]

The Fifth Circuit has held that *Beck* requires a state trial court to give a lesser–included offense instruction "if the jury could rationally acquit on the capital crime and convict for the noncapital crime."[53]  Under Texas state law — which the Fifth Circuit has found consistent with *Beck*[54] — the defendant is

---

[50] *See Strickland v. Washington*, 466 U.S. 668, 689 (1984).

[51] *See Beck v. Alabama*, 447 U.S. 625, 642–43 (1980).

[52] *Id.*

[53] *See East v. Scott*, 55 F.3d 996, 1005 (5th Cir. 1995).

[54] *See Aguilar v. Dretke*, 428 F.3d 526, 531 & n.2 (5th Cir. 2005).

No. 11-70013

entitled to a requested lesser–included offense charge only if "the evidence of the lesser offense would be sufficient for a jury rationally to find that the defendant is guilty only of that offense, and not the greater offense."[55]

Under the Texas Penal Code, a defendant is guilty of capital murder if he commits more than one murder either "during the same criminal transaction . . . or . . . pursuant to the same scheme or course of conduct."[56] The CCA has held that the latter category of capital murder includes "serial" murders.[57] At trial, the prosecution charged Feldman with capital murder under both of the alternative routes available under the Penal Code, and the trial judge refused Feldman's request for a jury instruction on the lesser-included offense of simple murder.

In his direct appeal to the CCA, Feldman argued that *Beck* obligated the trial judge to instruct the jury on the lesser-include offense of simple murder. In rejecting Feldman's claim, the CCA conceded that a rational jury could have found that the murders did not occur "during the same criminal transaction," reasoning that the evidence showed a geographic and temporal gap between the two killings.[58] However, it determined that a rational jury had to conclude that Feldman committed the murders "pursuant to the same scheme or course of conduct" — that is, that his murders were "serial" — noting that Feldman committed the murders "on the same evening with the same gun while out on a single car [sic] trip," and that Feldman himself had testified that he committed

---

[55] *See Rousseau v. State*, 855 S.W.2d 666, 673 (Tex. Ct. App. 1993).

[56] *See* Tex. Penal Code § 19.03(7).

[57] *See Corwin v. State*, 870 S.W.2d 23, 28 (Tex Crim. App. 1993).

[58] *See Feldman v. State*, 71 S.W.3d 738, 753–54 (Tex. Crim. App. 2002). The CCA explained that it had previously defined the statutory phrase "same criminal transaction" as "a continuous and uninterrupted chain of conduct occurring over a very short period of time . . . in a rapid sequence of unbroken events." *See id.* at 752–753.

No. 11-70013

both killings in a fit of rage triggered by his initial traffic altercation with Mr. Everett.[59] Though Feldman argued that his second murder was "motiveless," the CCA rejected this argument as having no basis in the record.[60]

In habeas proceedings before the district court, Feldman offered two theories as to why the CCA's adjudication of his *Beck* claim was unreasonable. First, Feldman made a conclusory assertion that the CCA erred in finding that no rational jury could acquit him of capital murder.[61] Second, Feldman argued that because the CCA determined that a rational jury could have acquitted him on *one* of the two theories of capital murder charged by the prosecution, *Beck* required the CCA to hold that the trial court erred in not issuing an instruction for simple murder.[62]

In reviewing the CCA's decision, the district court began by observing that "*Beck*, strictly speaking, holds only that a state cannot impose a blanket ban on the giving of lesser–included offense instructions in a capital case."[63] However, it found that "the Fifth Circuit has consistently applied *Beck*'s holding when the state trial court refuses a lesser-included-offense instruction," and evaluated the CCA's decision under Fifth Circuit precedent.[64]

---

[59] *See id.* at 754.

[60] *See id.* at 753–54.

[61] *See* Brief in Support of Petition for Writ of Habeas Corpus, *supra* note 37, at 9 ("The truth is that the jury might well have had doubts about whether Feldman's conduct was a part of one 'scheme or course of conduct' based on a common understanding of the phrase.").

[62] *Id.* at 9–11.

[63] *See Feldman v. Thaler*, No. 3:07-CV-1284-P, 2011 WL 1666937, at *4 (N.D. Tex. 2011) (quoting *Cordova v. Lynaugh*, 838 F.2d 764, 767 (5th Cir. 1988)) (internal quotation marks omitted).

[64] *See id.* at *4.

No. 11-70013

The district court rejected Feldman's first theory of error under § 2254(d), agreeing with the CCA that the record contained no evidence upon which a rational jury could have acquitted Feldman of capital murder.[65]  Proceeding to Feldman's second theory of error, that *Beck* mandates a simple murder instruction whenever a rational jury could acquit a defendant on one theory of capital murder, the district court held that Feldman's novel interpretation of *Beck* was clearly precluded by § 2254(d)(1).[66]

Feldman argues that reasonable jurists could dispute the district court's decision on both counts.  We disagree.  Even assuming that the district court was correct to evaluate Feldman's *Beck* claim under Fifth Circuit precedent,[67] it was plainly justified in rejecting both of Feldman's theories under § 2254(d).[68]

As the CCA noted, Feldman's first theory of error — which amounts to little more than a conclusory assertion that a rational juror could have acquitted him of capital murder[69] — is controverted by his testimony that he killed both

---

[65] *See id.* at *5–6.

[66] *See id.* at *6.

[67] *Cf. Parker v. Matthews*, 132 S.Ct. 2148, 2155 (2012) ("[C]ircuit precedent does not constitute clearly established law as determined by the Supreme Court") (internal quotation marks omitted).

[68] Indeed, and though we need not decide for purposes of this opinion, the district court should arguably have reviewed Feldman's claim under the more deferential standard of § 2254(e)(1).  The CCA made a factual determination that the evidence required a rational juror to conclude that Feldman's murders were "pursuant to the same scheme or course of conduct." *Cf. De La Rosa v. Lynaugh*, 817 F.2d 259, 263 (5th Cir. 1987) (holding that the determination of whether a reasonable juror could have found an element of a crime satisfied is "primarily factual").  Arguably, the CCA's determination should have thus enjoyed a presumption of correctness rebuttable only by clear and convincing evidence of error.  *See* 28 U.S.C. § 2254(e)(1).

[69] *See* Brief for Petitioner-Appellant, *supra* note 1, at 21 ("In the present context, [the] question is simply whether rational jurors could have believed from the uncontroverted evidence of Feldman's conduct that he did not commit 'serial' murders or that the murders he committed were not otherwise pursuant to a single 'scheme o[r] course of conduct.'  The question practically answers itself.  Not only were the jurors authorized by the court's charge

16

Messrs. Everett and Velasquez in a fit of rage ignited by the initial traffic altercation with Mr. Everett.   It is also controverted by Feldman's brief to this court, in which he concedes that he killed Mr. Vasquez because "[his] anger was unexpectedly rekindled by the sign of an Exxon truck driver refilling the fuel supply at a roadside gas station."[70]  Feldman's brief points to no evidence which would tend to show that the CCA's determination was incorrect, let alone unreasonable.[71]  Nor can we find any such evidence in the record.

Feldman's second theory of error relies on a tortured reading of *Beck* plainly precluded by §2254(d)(1).   Feldman claims that *Beck* mandates a lesser–included offense instruction whenever a rational juror could acquit the defendant on any *one* theory of capital murder.  This reading of *Beck* ignores the case's underlying logic: where, as in this case, a defendant has been charged with capital murder under *two* separate theories, the *Beck* dilemma — that a jury might be coerced into returning an erroneous guilty verdict on a capital crime merely to avoid setting the defendant free — arises only if a rational jury could acquit the defendant on *both* theories.[72]  Feldman's incoherent reading of *Beck* cannot possibly be considered "clearly established Federal law" within the meaning of 2254(d)(1).[73]

---

to do just that; it was also well within rational discretion for them to do so in fact, based on the ordinary or technical meaning of the applicable words and phrases.").

[70] *See id.* at 4.

[71] *See id.* at 21.

[72] *See Beck v. Alabama*, 447 U.S. 625, 642–43 (1980).

[73] In fact, Feldman's interpretation of *Beck* conflicts directly with Texas and Fifth Circuit precedent.   *See Arevalo v. State*, 970 S.W.2d 547, 549 (Tex. Crim. App. 1998) (holding that a defendant is not entitled to a lesser–included offense instruction unless "there is evidence which, if believed, refutes or negates every theory which elevates the offense from the lesser to the greater"); *East v. Scott*, 55 F.3d 996, 1005 (5th Cir. 1995) (holding that defendant is only entitled to a lesser–included offense instruction "if the jury could rationally acquit on the capital crime and convict for the noncapital crime").

No. 11-70013

## V.

Finally, Feldman seeks to appeal the claim that his trial violated the Sixth and Fourteenth Amendment, arguing that the trial judge wrongfully excluded Ms. Diane Dreifke from the jury merely on the basis of her conscientious scruples against the death penalty.

In *Witherspoon v. State of Illinois*, the Supreme Court struck down a state statute that permitted the for-cause exclusion from a capital case of any juror who voiced "conscientious scruples against capital punishment."[74] The Court reasoned that the statute impermissibly tilted juries in favor of capital punishment in violation of a defendant's Sixth and Fourteenth Amendment right to an impartial jury.[75] However, in *Wainwright v. Witt*, the Supreme Court clarified that a juror could be excluded whenever his views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."[76]

*Wainwright* also emphasized that an exclusion order is not improper merely because the paper record fails to demonstrate a potential juror's bias with "unmistakable clarity."[77] Because "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made unmistakably clear," reviewing courts should generally defer to the determination of the trial judge, who sees and hears the juror.[78] "[W]here . . . there is lengthy questioning of a prospective juror and the trial court has

---

[74] *See* 391 U.S. 510, 512, 523 (1968).

[75] *See id.* at 518, 523.

[76] *See* 469 U.S. 412, 424 (1985).

[77] *Id.* at 424–26.

[78] *Id.* (internal quotation marks omitted).

18

No. 11-70013

supervised a diligent and thoughtful voir dire, the trial court has broad discretion."[79]

To assess the appealability of Feldman's claim, we briefly review the evidence in the record. At the beginning of the voir dire, Ms. Dreifke repeatedly stated that she supported the death penalty and could impose it in accordance with Texas law:

> Q: "I want to know, is there anything about [Feldman], the way he looks, anything that you may think that would prevent you from assessing the death penalty if we prove our case to you?"
> A: "No."
> Q: "Because now is the time to tell us."
> A: "No."
> Q: "Some people say, yeah, I just — I can't do it. Do you feel like you're the type of individual that could be involved with a situation, knowing what our position is, and participating and being responsible for ultimately the execution of another human being?"
> A: "Yes, if that's what is proven to me."[80]

However, under subsequent questioning by the prosecution, Ms. Dreifke admitted that she had not given the death penalty much thought and began expressing doubts:

> Q: "Have you given [the death penalty] much thought prior to filling out the questionnaire?"
> A: "Not prior to filling out the questionnaire."
> Q: What about since?"
> A: "Since then, yes . . . I've thought about how it would affect me afterwards . . . [h]ow it would, maybe psychologically and scare me, things like that, would I have recurring dreams, things like that."[81]

---

[79] *Uttecht v. Brown*, 551 U.S. 1, 20 (2007).

[80] Reporter's Record, *supra* note 27, vol. 21, at 114.

[81] *Id.* at 115.

No. 11-70013

Moreover, once the prosecutor graphically described the execution process to Ms. Dreifke, she repeatedly stated that she did not think she could participate in a course of action that would result in the execution of another human being:

> Q: " . . . do you think you're the type of individual that could answer the questions, knowing that will result in the execution of another man?
> A: "I don't think I could.  I don't think I could."
>                              ***
> Q: "So again, you're telling me that you couldn't participate in it?"
> A: "I don't think I could do it."
>                              ***
> Q: "Just so the record is clear, Ms. Dreifke, you understand if you took the oath to follow the law, if the evidence is there, basically, if we convinced you, we have the evidence, that would be something you would have to do, and it would just go against your conscience, basically; right?
> A: "Right."
> Q: "A burglary case or some other case where the death penalty is not an issue, it sounds like you would be a fine juror, but it's just this issue of being required, if the evidence is there, to basically —
> A: "Sentence someone to ending their life, yes."[82]

After the prosecution had finished questioning Ms. Dreifke, the trial judge gave the defense an opportunity to rehabilitate her.  It declined.[83]

On direct appeal to the CCA, Feldman argued that the trial judge's exclusion of Ms. Dreifke from the jury violated *Witherspoon* and its progeny. The CCA rejected Feldman's claim, observing that "[b]ecause Dreifke vacillated on her ability to follow the law and ultimately told the court that she was not sure whether she could perform the duty entrusted her, the trial judge was within his discretion in determining that her views on capital punishment would

---

[82] *Id.* at 129–30.

[83] *Id.* at 130.

No. 11-70013

have prevented or substantially impaired the performance of her duties as a juror in accordance with her instructions and her oath."[84]

In his brief to the district court, Feldman conceded that Ms. Dreifke found the prospect of imposing a death sentence emotionally difficult, but argued that her voir dire testimony — viewed as a whole — clearly indicates that she was willing and able to serve as a capital juror.[85] After carefully examining the voir dire transcript, the district court upheld the CCA's determination as reasonable and denied habeas relief under § 2254(d).[86]

As the trial court's decision to exclude Ms. Dreifke was made after a thorough and fair voir dire process that included lengthy questioning by the prosecution and an opportunity for the defense to rehabilitate, the CCA would have been entitled to defer to that decision even if the printed record was ambiguous;[87] as Feldman acknowledges in his brief, vacillating answers are a sufficient ground for exclusion.[88] This, however, is a case where the printed record clearly supports a finding that Ms. Dreifke's views would have substantially impaired her ability to impose a capital sentence. Viewed chronologically, the record paints the picture of a juror who not only vacillated about her ability to impose a death sentence, but of one who — on gaining full

---

[84] *See Feldman v. State*, 71 S.W.3d 738, 750 (Tex. Crim. App. 2002).

[85] Brief in Support of Petition for Writ of Habeas Corpus, *supra* note 37, at 19.

[86] *See Feldman v. Thaler*, No. 3:07-CV-1284-P, 2011 WL 1666937, at *8–9 (N.D. Tex. 2011).

[87] *See Uttecht v. Brown*, 551 U.S. 1, 8–9 (2007).

[88] *See* Petitioner-Appellant's Brief, *supra* note 1, at 28–29; *see also Gomez v. Quarterman*, 529 F.2d 322, 332 (5th Cir. 2008) (upholding state court's exclusion of juror who gave inconsistent responses).

information about the execution process — concluded that she was likely incapable of doing so.[89]

The CCA's rejection of Feldman's *Witherspoon* claim was thus plainly reasonable, and no jurist of reason could debate the district court's denial of habeas relief under § 2254(d).[90]

## VI.

The motion for a certificate of appealability is DENIED.

---

[89] *Cf. United States v. Jackson*, 549 F.3d 963, 973 (5th Cir. 2008) (upholding federal district court's exclusion of juror, as though juror's voir dire responses were initially inconsistent, she ultimately stated that she would not vote for death).

[90] In fact, the Third Circuit has held that the arguably more deferential §2254(e)(1) standard applies to a trial court's determination of jury bias. *See Martini v. Hendricks*, 348 F.3d 360, 363 (3d Cir. 2003). Indeed, the Supreme Court's pre-§ 2254(e)(1) jurisprudence suggests that § 2254(e)(1) should apply. *See Smith v. Phillips*, 455 U.S. 209, 218 (1982) (holding that a trial judge's findings relating to juror bias "are presumptively correct under 28 U.S.C. § 2254(d)"). *But see Irvin v. Dowd*, 366 U.S. 717, 723 (1961) (holding that juror bias is a "mixed [question of] law and fact" and that therefore the federal habeas court must "independently evaluate the voir dire testimony").

However, as we find that jurists of reason could not debate the district court's denial of relief under § 2254(d), we do not determine whether the district court should have applied § 2254(e)(1).